Filed 9/12/13  P. v. Valdez CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B243014 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. VA114479) |
| v. | |
| BRANDON J. VALDEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Philip H. Hickok, Judge.  Affirmed as modified.

Susan K. Shaler, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews and Connie H. Kan, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Defendant Brandon J. Valdez appeals from his conviction of first degree murder and possession of a firearm by a felon. He contends it was error: (1) to admit into evidence an identification based on an impermissibly suggestive photographic lineup; and (2) to fail to instruct that a prosecution witness was an accomplice. We modify the judgment and otherwise affirm.[1]

## FACTUAL AND PROCEDURAL BACKGROUND

Viewed in accordance with the usual rules on appeal (*People v. Zamudio* (2008) 43 Cal.4th 327, 357-358), the evidence established that in May 2009, defendant was a member of the criminal street gang known as Whittier Varrio Locos (WVL). Murder victim Danny Quijada was a member of a rival gang known as Rivera 13. Quijada lived in an apartment complex on the 6300 block of Milton Avenue in Whittier, a location claimed by WVL as its territory. There were rumors that Quijada was selling drugs from his apartment and that he had quarreled with WVL member Joshua Poore. At about 5:30 p.m. on May 16, defendant fatally shot Quijada while Quijada was standing on the sidewalk in front of his apartment complex. Defendant maintained that he was not the shooter and was at a birthday party in Rancho Cucamonga at the time.

---

[1] Defendant was charged with first degree murder and possession of a firearm by a felon; prior prison term, gun use and gang enhancements were also alleged. A jury convicted defendant on both counts and found true the gun use and gang enhancements. He was sentenced to 50 years to life in prison on the murder charge, comprised of 25 years to life for first degree murder, plus a consecutive 25 years for the gun use enhancement. The trial court stayed imposition of sentence on the felon in possession charge and the gang enhancement pursuant to Penal Code section 654 (all future undesignated statutory references are to the Penal Code). Defendant timely appealed.

In addition to defendant's principal contentions on appeal, he also argues, and the People concede, that the abstract of judgment incorrectly reflects a $240 restitution fine (§ 1202.4, subd. (b)) and a $240 parole revocation restitution fine (§ 1202.45). We agree and direct the superior court to correct the abstract of judgment to reflect a $200 restitution fine and $200 parole revocation restitution fine.

A.     *The People's Case*

Witness Frank Orozco was 29 years old at the time of the January 2012 trial.  He lived in the same neighborhood as Quijada and was a former gang member.  Orozco was arrested but not charged in this case after witness Joseph B. identified Orozco as the person standing next to the shooter.  Orozco's audio-recorded interview with police, in which he identified defendant as the shooter, was played for the jury.  In that interview, Orozco stated that he and defendant were childhood friends, but went their separate ways when defendant became more involved in his gang.  Orozco met Quijada once and knew he was a member of the Rivera 13 gang, a rival to WVL.  Several months before the shooting, Orozco heard that Quijada had pulled a shotgun on WVL member "Josh," but that they later resolved their differences.  The afternoon of the shooting, Orozco walked alone to the apartment complex where Quijada lived to buy some marijuana from another resident.  When Orozco arrived, he saw defendant enter a gate leading into the courtyard.  Orozco saw defendant go upstairs.  Orozco left almost immediately after some children playing in the courtyard told him that the seller was not home.  As Orozco was walking out of the gate, he noticed defendant right behind him.  Defendant looked like he was under the influence of something, possibly methamphetamine.  Orozco said to defendant, "What's up?" to which defendant responded, "Get out of here."  Sensing something was going to happen, Orozco walked away.  Glancing back, Orozco saw Quijada come out of the gate.  Defendant pointed a gun at Quijada and pulled the trigger.  Fearful he might be shot next, Orozco ran home.  Orozco later heard that the reason defendant had shot Quijada was that Quijada was selling methamphetamine in WVL territory.  Orozco identified defendant from a photographic lineup (People's Exhibit No. 23) but said he was afraid he would be killed by other WVL members if he had to testify against defendant in court.  Orozco was released from custody that day and was not charged with Quijada's murder.

At trial, Orozco again said he knew defendant from school, but denied they were friends.  Orozco did not know who shot Quijada, but knew it was not defendant.  Orozco

3

had named defendant as the shooter only after the officers mentioned defendant; he did so because they were threatening to charge him with the murder.[2] Orozco was not aware of anyone walking behind him as he left the apartment courtyard, but he saw someone, not defendant, walking from the alley towards the apartment complex. As he was walking away, the sound of gunshots caused Orozco to glance back and he saw someone running away.

Joseph B. lived in Quijada's apartment complex and knew Orozco from the neighborhood. The afternoon of the shooting, while skateboarding in front of the complex, Joseph noticed Orozco and a light skinned Hispanic man wearing a baseball cap enter the gate into the apartment complex. Both men were wearing baggy, gang-like attire but the man in the baseball cap was shorter and thinner than Orozco. Alarmed by the gang-like appearance of Orozco and the other man, Joseph skateboarded away. Joseph saw Orozco and the man in the baseball cap exit the apartment complex a few moments later. About a minute after that, Joseph saw Quijada come through the gate. When Joseph saw Quijada calmly speaking to the man in the baseball cap, Joseph felt it was safe to move back towards them.[3] Joseph was about 10 feet away when he saw the man in the baseball cap pull out a gun and shoot Quijada. When the shooting started, Orozco looked shocked and ran away. The shooter did not look shocked. The shooter then ran toward the alley, in the opposite direction from Orozco. After the shooter turned

---

**2** Lead investigator Detective Chad Hoeppner, who interviewed Orozco, testified that no one told Orozco to identify defendant as the shooter; the police knew nothing about defendant until Orozco identified him. Defendant's mother testified that, on more than one court date, Orozco apologized to her for all the grief he had caused her family.

**3** Joseph testified that he heard the man in the baseball cap and Quijada speaking in a foreign language, possibly Spanish. Defendant's mother testified that defendant could not speak Spanish.

4

to run, Joseph noticed the letters WVL tattooed on the back of his head, partially hidden by the baseball cap.  Joseph could not identify defendant as the shooter.[4]

The sound of gunshots drew the attention of Rebecca Martinez who lived in the same building as Quijada, and Robert D., who lived in a building across the alley.  From their respective apartments, Martinez and Robert could see the T-intersection where the north/south alley dead-ended into an east/west alley.  From her window, Martinez saw a young, skinny, light-skinned, not very tall man wearing oversize baggy shorts, a long short-sleeve t-shirt and a baseball cap, run south on Milton Avenue, turn right (west) into the alley that runs between Milton and Newlin Avenues, then turn right (north) into the alley that runs behind Milton and Newlin Avenues.  Martinez could not identify the person from a photographic lineup.

Looking out his front door, Robert expected to see a car zooming past.  At first he saw nothing unusual but kept looking until, about 35 feet away, he saw a tall, thin, medium-skinned man wearing shorts, a t-shirt and a baseball cap running west in the alley, toward Newlin.  As the man turned north at the intersection of the two alleys, he stumbled and his cap slipped off, revealing a tattoo on the back of his head.  Robert told police at the scene that he saw someone running in the alley after hearing shots.  That night, Robert helped police retrieve video from his building's surveillance cameras but no

---

**4**  Danny M. who was skateboarding with Joseph, also testified at trial, but claimed to remember only hearing gunshots.  He did not recall testifying at the preliminary hearing that he saw on the street Orozco and another tall, light-skinned man with a tattoo when Quijada was shot.  Or that, after the shooting, he saw the man with the tattoo running towards the alley.  Detective Hoeppner testified that Danny was cooperative during his initial interviews, but when Hoeppner served Danny with a subpoena to testify at the preliminary hearing, Danny said he was afraid he would be killed if he testified.  Danny had to be arrested and brought to the preliminary hearing.  After he was subpoenaed to testify at trial, Danny claimed to not remember anything about the shooting.

one asked him about the person he saw running in the alley.[5] Some months later, Robert saw defendant's photograph as part of a newspaper article about defendant's arrest.

Some two years later, in the summer of 2011, Robert was contacted by police and shown a photographic lineup (Defense Exhibit No. W) from which he identified defendant as the person he saw running in the alley on May 16, 2009. Robert identified defendant a second time from a photographic lineup shown to him just before he testified in January 2012 (People's Exhibit No. 43), and a third time in the courtroom.

The murder weapon was never found. Three shell casings were found on the sidewalk near Quijada's body, two spent rounds were found near the gate leading into the apartment complex and two bullets were recovered from Quijada's body. A few days after the murder (before Orozco identified defendant as the shooter) defendant was one of several WVL members present when officers executed a search warrant at a house in the City of Rowland Heights looking for Joshua Poore, the WVL member with whom Quijada was rumored to have quarreled.[6] Police recovered 26 live rounds of .44 caliber ammunition, 87 live rounds of .380 caliber ammunition and an empty .380 magazine clip. A criminalist determined that the three cartridge cases and one bullet found at the scene of the shooting, as well as the two bullets recovered from Quijada's body, were all fired from the same weapon. All of the bullets and cartridges could have been fired from a .380 AMT semiautomatic which matched the type of magazine found at the Rowland Heights home. The criminalist could not determine whether or not the analyzed bullets and/or cartridges were fired from this particular magazine.

---

[5]     Detective Hoeppner initially testified that Robert's name was not in any of the police reports. But he conceded that one of the officers tasked with obtaining the video wrote a report according to which Robert stated he heard four pops and then saw a male Hispanic driving a Ford Taurus at a high rate of speed southbound through the alley. The report does not state that Robert mentioned someone running in the alley.

[6]     Police concluded that Poore was not a suspect because witnesses said the shooter had a tattoo on his head and Poore had no tattoo.

B.     *Defense Case*

Defendant's sister, Jessica Valdez, testified that in May 2009, she and defendant lived together.  Defendant was present when she returned home from work at about noon on May 16.  They were together until defendant left later that day, but Valdez did not know what time or where he went.  Valdez never gave this information to the police, but told defendant's lawyer a few days after the trial started.

Valerie Machado and defendant had been romantically involved "off and on" since 1997.  On May 16, Machado lived in an apartment in Rancho Cucamonga with her cousin, Destiny Salinas, and Salinas's boyfriend, Ricardo Alvarado.  At about 4:00 p.m. that day, defendant arrived at Machado's apartment to attend a birthday party for Alvarado.  A little after midnight, Machado's sister took pictures of defendant and Machado with her cell phone.  Defendant remained at Machado's apartment for two or three days.

Salinas recalled that on the day of Alvarado's birthday party, she was looking out the front window when a big, black truck or SUV pulled up outside the apartment. Salinas went into the kitchen and a moment later defendant entered the apartment, from which Salinas deduced he had arrived in the SUV.  Defendant was at the apartment until about midnight, when he went with Alvarado to pick up someone who lived down the street; they were gone 20 minutes.  The party ended about 2:00 a.m. when everyone went to sleep.  Salinas could not recall if defendant was still there when she got up in the morning.

Adrianna Thompkins was friendly with several members of WVL, including defendant.  She could not remember the exact date, but sometime around May 16, she recalled driving defendant in her truck to his girlfriend's apartment in Rancho Cucamonga.

**DISCUSSION**

A.    *Robert D.'s Identification Was Not the Result of an Impermissibly Suggestive Procedure*

Defendant contends he was denied a fair trial and due process under the state and federal constitutions as a result of the trial court allowing into evidence, over defense objection, Robert's identification of defendant based on the photographic lineup shown to him in September 2011 (Defense Exhibit No. W).**7** He contends this is so because Robert told police that the person he saw running down the alley had a thin face and a tattoo on his head, and defendant has the thinnest face and is the only person with a tattoo in the lineup. We are not persuaded.

Generally, we review for abuse of discretion a trial court's decision on the admissibility of evidence. (*People v. Williams* (1997) 16 Cal.4th 153, 196-197.) But a trial court's ruling that a pretrial identification procedure was not impermissibly suggestive is subject to our independent review. (*People v. Avila* (2009) 46 Cal.4th 680, 700 (*Avila*).) It is the defendant's burden to show that the identification procedure was so unfair as to abridge his right to due process. (*Ibid*.)

" 'Due process requires the exclusion of identification testimony only if the identification procedures used were unnecessarily suggestive and, if so, the resulting identification was also unreliable.' [Citation.]" (*Avila, supra*, 46 Cal.4th at p. 698; see also *People v. Cook* (2007) 40 Cal.4th 1334, 1355 [due process violation occurs only if the identification procedure is so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification].) Thus, determination of whether an identification procedure violated due process is a two-step analysis. First, we consider whether the identification procedure was unduly suggestive. "[T]here is no requirement that a defendant in a lineup, either in person or by photo, be surrounded by others nearly

---

**7**    Defendant did not include copies of the challenged photographic lineup in the record on appeal. We take judicial notice of Defense Exhibit W, People's Exhibit No. 23 and People's Exhibit No. 43. (Evid. Code, § 452, subd. (d)(1); § 459, subd. (a).)

8

identical in appearance. [Citation.] Nor is the validity of a photographic lineup considered unconstitutional simply where one suspect's photograph is much more distinguishable from the others in the lineup. [Citations.]" (*People v. Brandon* (1995) 32 Cal.App.4th 1033, 1052.) " 'Because human beings do not look exactly alike, differences are inevitable. The question is whether anything caused defendant to "stand out" from the others in a way that would suggest the witness should select him.' [Citation.]" (*People v. Gonzalez* (2006) 38 Cal.4th 932, 943 (*Gonzalez*).)

Only if we determine that the identification procedure was unduly suggestive, need we address the second prong of the test: "whether the identification itself was nevertheless reliable under the totality of the circumstances . . . ." (*People v. Cunningham* (2001) 25 Cal.4th 926, 989.) In *People v. Kennedy* (2005) 36 Cal.4th 595, the court explained, " 'In order to determine whether the admission of identification evidence violates a defendant's right to due process of law, we consider (1) whether the identification procedure was unduly suggestive and unnecessary, and, if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances, taking into account such factors as the opportunity of the witness to view the suspect at the time of the offense, the witness's degree of attention at the time of the offense, the accuracy of his or her prior description of the suspect, the level of certainty demonstrated at the time of the identification, and the lapse of time between the offense and the identification.' " (*Id.* at p. 608, overruled on another ground in *People v. Williams* (2010) 49 Cal.4th 405, 459.)

Applying these factors, the *Gonzalez* court concluded that a live lineup was not unduly suggestive where the defendant was the only person with "Lott Stoners 13" tattooed on the back of his head. The court reasoned that none of the witnesses had observed a tattoo on the gunman's head and it was only after the witnesses recanted that they claimed the tattoo was significant. (*People v Gonzalez, supra,* 38 Cal.4th at p. 944; see also *Cook, supra*, 40 Cal.4th at p. 1355 [live lineup was not unduly suggestive where the defendant was the shortest person in the lineup]; *People v. DeSantis* (1992) 2 Cal.4th 1198, 1222 [photographic lineup not unduly suggestive where witness described the

9

perpetrator as wearing a red jacket and the defendant was the only person in the lineup wearing a red shirt].)

Here, defendant filed a pretrial motion to exclude Robert's September 2011 identification on the grounds that the photographic lineup shown to Robert at the time (Defendant's Exhibit No. W) was unduly suggestive because Robert had described the suspect as having a tattoo on his head and defendant was the only person in the lineup with a tattoo.[8] At the Evidence Code section 402 hearing, Detective Hoeppner explained that in June 2009, he created photographic lineup No. 195165, which included a photograph of defendant in position number five. At that time, Hoeppner printed a copy of photographic lineup No. 195165, which he showed to Orozco (People's Exhibit No. 23). Defendant's head tattoo is not discernable on the June 2009 printout. In September 2011, Hoeppner printed out another copy of photographic lineup No. 195165 to show Robert (Defendant's Exhibit No. W). Although it is the identical photo six pack, defendant's tattoo is visible on the September 2011 printout because, sometime between June 2009 and September 2011, the Sheriff's Department began using new technology that produced clearer photographs. After ascertaining that Robert had not been shown a version of lineup No. 195165 without a visible tattoo, the trial court ordered that it be done. The next day, before Robert testified, he was shown another printout of lineup No. 195165 (People's Exhibit No. 43), in which defendant's tattoo was not visible but which otherwise had the same face shots in the same order as the 2009 lineup. On People's Exhibit No. 43, Robert identified defendant as the person he saw running in the alley. Based in part on the corroborative identification Robert made from People's Exhibit No. 43, the trial court concluded that Robert's original identification was admissible because it was not the result of an impermissibly suggestive identification procedure. Robert identified defendant a third time in the courtroom and testified that his

---

[8] Defendant also complains that defendant stood out because he had the thinnest face of the six persons depicted in the photographic lineup. This is simply not the case. In our judgment and after reviewing the lineup, we conclude that defendant is not the only person with a thin face.

10

September 2011 identification was based entirely on his memory of defendant's face, in particular its thin shape, and was not influenced by the fact that defendant was the only person with a tattoo depicted on Defense Exhibit No. W.

We have reviewed the challenged September 2011 photographic lineup (Defense Exhibit No. W), compared it to the unchallenged June 2009 version shown to Orozco (People's Exhibit No. 23) and the second version shown to Robert (People's Exhibit No. 43) and conclude that Robert's identification was not the result of an impermissibly suggestive pretrial photographic lineup.

We agree with defendant that the visible tattoo caused defendant's photograph to stand out more than the other photographs.[9] But we conclude that, under the totality of the circumstances, the identification was nevertheless reliable. (*Kennedy, supra*, 36 Cal.4th at p. 608.) Four of the analytical factors identified by our Supreme Court and which we describe above militate in favor of our conclusion: (1) Robert had ample time (six to eight seconds) to view the suspect from a distance of between 30 and 35 feet away; (2) from Robert's testimony that he kept looking out his front door after at first seeing nothing it is reasonable to infer that Robert was paying particular attention; (3) Robert's identification of defendant was consistent with Orozco's identification and Robert's description of the suspect – a thin, young, medium-skinned male with a tattoo on his head wearing shorts, a t-shirt and a baseball cap running west and then north in the alley – and was also consistent with other witness's testimony; and (4) Robert expressed certainty each of the three times he identified defendant and expressly testified that he was not influenced by the tattoo. Although the two-year time span between the May 2009 event and Robert's September 2011 identification – the fifth factor – "weighs

---

[9] Contrary to defendant's argument, the fact that Robert saw a grainy surveillance video of a suspect running down the alley, and later saw a newspaper article about defendant's arrest which included a photograph of defendant, does not render his identification impermissibly suggestive. These images were not shown to Robert by law enforcement as part of the identification procedure. (Robert saw the surveillance tape because he was tasked with assisting the officers in obtaining a copy of the tape from his building's security cameras.) Therefore, the fact that Robert saw these images goes to the weight of his identification, not its admissibility.

11

against reliability to some degree," it is not enough here to establish a substantial likelihood of irreparable misidentification. (See *People v. Arias* (1996) 13 Cal.4th 92, 169 [identification not impermissibly suggestive despite 10-month lapse between the robbery and photographic lineup].) It is true that, if Robert had been shown a six-pack in which defendant was not the only person with a tattoo, his identification might have been viewed as even more reliable. But that is not the test. Instead, under the totality of the circumstances, we conclude that Robert's identification was not the result of an impermissibly suggestive procedure.

B.     *The Trial Court Had No Sua Sponte Duty to Give Accomplice Instructions*

Defendant contends he was denied a fair trial and due process by the trial court's failure to sua sponte instruct the jury that Orozco was or may have been an accomplice whose testimony should be viewed with caution (see CALCRIM No. 334 [witness may have been an accomplice] and CALCRIM No. 335 [witness was an accomplice]). He argues that substantial evidence including reasonable inferences suggest that Orozco was an accomplice to Quijada's murder. We disagree.

A "conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof." (§ 1111.) When a jury receives substantial evidence that a witness who has implicated the defendant was an accomplice, the trial court must sua sponte instruct that an accomplice's testimony implicating the defendant must be viewed with caution. (*People v. Houston* (2012) 54 Cal.4th 1186.)

Section 1111 defines an accomplice as "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." In *People v. Whalen* (2013) 56 Cal.4th 1, 58-59, our Supreme Court recently explained that, to be liable for prosecution for the identical offense (i.e., an accomplice), the witness must be a "principal," which section 31 defines as the direct perpetrator of the crime or one who aids and abets in its commission. "An

12

aider and abettor is one who acts with both knowledge of the perpetrator's criminal purpose and the intent of encouraging or facilitating commission of the offense. Like a conspirator, an aider and abettor is guilty not only of the offense he intended to encourage or facilitate, but also of any reasonably foreseeable offense committed by the perpetrator he aids and abets.' [Citations.]" (*Id.* at p. 59.) Presence at the scene of the crime, companionship with the perpetrator and conduct before and after the crime are relevant considerations in determining whether a person aided and abetted an offense. (*People v. Miranda* (2011) 192 Cal.App.4th 398, 407.) But it is well settled that neither mere presence at the scene of the crime which does not itself assist the commission of the crime, nor knowledge that a crime is being committed and failure to prevent it, amount to aiding and abetting. (See CALJIC No. 3.01.)

Here, although there was evidence that Orozco and defendant were friends, they were not in the same gang. (See *People v. Garcia* (2008) 168 Cal.App.4th 261, 277 [common gang membership relevant to intent element of aiding and abetting].) The only evidence connecting Orozco to the shooting is Joseph B.'s testimony that he saw Orozco and the shooter walk into the apartment complex, then exit the complex together, and saw them talking to one another. Orozco was standing about five feet away from the shooter and looked "shocked or scared" when the shooting started. As soon as the shooting started, Orozco ran away. The shooter looked neither shocked nor scared, and he ran in the opposite direction from which Orozco ran.

This evidence establishes nothing more than Orozco's presence and is not sufficient to support an inference that Orozco aided and abetted the shooting. It is not clear from Joseph's testimony whether defendant and Orozco went to the apartment complex together or, as Orozco claimed, they coincidentally arrived there at the same time. Even assuming they went together, there was no evidence from which it could be inferred that Orozco knew that defendant intended to commit a crime. Joseph's testimony that Orozco looked "shocked and scared" when the shooting started suggests Orozco had no knowledge that defendant had any criminal intent, much less the intent to

13

shoot Quijada.  Under this state of the evidence, the trial court had no sua sponte duty to give CALCRIM Nos. 334 or 335.

## DISPOSITION

The superior court is directed to modify the abstract of judgment to reduce the restitution fines imposed pursuant to Penal Code section 1202.4, subdivision (b), and Penal Code section 1202.45 from $240 to $200.  In all other respect, the judgment is affirmed.  Upon the issuance of the remittitur, the superior court is to prepare an amended abstract of judgment and deliver a copy to the Department of Corrections and Rehabilitation.


RUBIN, ACTING P. J.

WE CONCUR:


FLIER, J.


GRIMES, J.

14